UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE JERONIMO CARDOSO,<br><br>Petitioner,<br><br>v.<br><br>JAMES ROBINSON,<br><br>Respondent. | Case No.   1:19-cv-01497-AWI-HBK (HC)<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY [1]<br><br>FOURTEEN-DAY OBJECTION PERIOD<br><br>(Doc. No. 2) |

Petitioner Jose Jeronimo Cardoso ("Cardoso" or "Petitioner"), a state prisoner proceeding with counsel, has pending a petition for writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. No. 2, "Petition").  The Petition raises three grounds of ineffective assistance of trial counsel: (1) for failing to object to the prosecutor's misstatement of the law related to the provocation doctrine, (2) for failing to investigate and present a provocation defense, and (3) for failing to consult with and present a defense gang expert.  The Petition also raises a claim of cumulative error.  (*Id*. at 4-5).  For the reasons set forth below, the undersigned recommends the district court deny Petitioner

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

1  any relief on his Petition and decline to issue a certificate of appealability.

2  **BACKGROUND**

3  ### A.  Procedural History

4  Petitioner initiated this case on October 21, 2019, by filing a petition for writ of habeas

5  corpus under 28 U.S.C. § 2254.  (Doc. No. 2).  In response, Respondent lodged the pertinent state

6  court record on May 29 and June 4, 2020, and filed an answer to the Petition on June 12, 2020.

7  (Doc. Nos. 12-15).  After an extension of time, Petitioner filed a traverse on August 12, 2020.

8  (Doc. No. 18).  On November 17, 2020, the case was reassigned to the undersigned.  (Doc. No.

9  19).  The matter is deemed submitted on the record before the Court.

10  ### B.  Facts Based Upon the State Court Record

11  In 2013, a Kings County jury convicted Cardoso of premeditated attempted murder and

12  shooting at an inhabited dwelling and found true gang and firearm enhancements.  (Doc. No. 2 at

13  1).  The gang enhancements were reversed on direct appeal, and Petitioner is serving a sentence

14  of 32 years-to-life.  (*Id.*; Doc. No. 14-7).  The Court adopts the pertinent facts of the underlying

15  offenses, as summarized by the California Court of Appeal.  Unless a petitioner demonstrates by

16  clear and convincing evidence otherwise, a presumption of correctness applies to these facts.  *See*

17  28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

18  *The Charged Offenses*

19  As of January 2013, Christian Hernandez had been seeing Anisa
   Rosales off and on for about a year.[2]
20

21  FN [2]: Unspecified references to dates in the statement of
   facts are to the year 2013.

22  They broke up in September 2012, when Hernandez learned she
   was seeing Cardoso.[3]
23

24  FN [3]: According to Rosales, who testified under a grant of
   immunity, she and Hernandez broke up around the end of
25  January 2012, because Hernandez physically abused her on
   multiple occasions. Hernandez was violent and jealous and
26  always carried a gun. Rosales began dating Cardoso in
   February 2012, and continued to see him until January
27  2013. During that time, Cardoso did not have a car. A few
   days before the shooting, however, she saw Cardoso driving
28  a small silver car that looked like a Honda. She saw Cardoso
   with an older, rusted, western-type revolver a week or a few

2

weeks before the shooting. Cardoso knew about Hernandez, because Hernandez would "blow up" Rosales's phone every day. Rosales never heard Cardoso say he wanted Hernandez dead. However, Hernandez said on numerous occasions that he wanted Cardoso dead, because Rosales wanted to be with Cardoso rather than Hernandez. Hernandez continually harassed and threatened Cardoso and Cardoso's family, and Rosales and her family.

Rosales met Mendez one time, a week or a few weeks before the shooting. He was with Cardoso.

Hernandez saw Rosales frequently and continued to have a sexual relationship with her, even after they broke up. Hernandez never confronted Cardoso about Cardoso's relationship with Rosales.

Hernandez was at Rosales's house late on the night of January 22. Around midnight, someone knocked on the window. Hernandez was curious who was knocking at the window so late, but Rosales would not answer him. The couple argued and Hernandez—who believed Cardoso had been at the window—choked Rosales, then called 911 to have himself arrested.[4]

FN [4]: According to Rosales, she was going to let Hernandez stay the night with her, because he had nowhere to go. There was a knock on her window; when she went to the door, it was Cardoso, who asked to come in. She told him no and to calm down and they would talk, but he did not calm down and just left. She went back inside. Hernandez knew who had come to the door, and was angry about it, so he asked her to have sex. She said no that she was with Cardoso, and that was what started the argument. Hernandez got on top of her on the bed and put his hands around her throat. She yelled for her mother, who told Hernandez to get out.

A police officer came and took Hernandez to the Tulare County-Kings County line and dropped him off. Hernandez telephoned his mother to come and pick him up.[5]

FN [5]: According to Anita Avila, Hernandez's mother, Hernandez called her around midnight and asked if she could pick him up at Rosales's house. He said he was afraid and that one of the defendants was outside with a gun. Avila was unable to go, however. About 30 minutes later, Hernandez called again and asked if Avila could pick him up at the Kings County line. Avila went and got him.

Sometime after 1:00 p.m. on January 23, Avila dropped Hernandez off at Fernot and Lassen, in Hanford, to visit his friend Elijah Crockett. Crockett, who lived at the Kings Garden Apartments in the 1200 block of Fernot Way, and Hernandez spent some time outside the apartments, then Crockett went to his aunt's house on the corner of Fernot. He stayed 30 to 45 minutes, as his uncle, Jose Mims, had just gotten out of the hospital.

Hernandez stood by the curb in front of the house for about 30 minutes, waiting for Crockett. A silver compact car containing defendants and Rosales drove slowly by.[6]

> FN [6]: Defendants were in the front seat. Hernandez could not recall which one was driving. Rosales was in the backseat. Hernandez knew Cardoso as Squiddy, but had never talked to either defendant. Hernandez had telephoned Rosales that day to tell her he was coming to town. When he first talked to the police after getting shot, he did not say anything about Rosales being in the car.

Hernandez made eye contact with them. Because they were driving so slowly and looking at him, he felt awkward. He had not had problems with either defendant before that day.

Hernandez watched the car go by. It went to Fernot and Lassen, stopped, and then quickly made a U-turn.[7]

> FN [7]: The segment of Fernot Way involved in this case is intersected on one end by Lassen Drive and on the other end by Connie Drive.

Hernandez started running toward the backyard of the house Crockett was in. Things "just didn't feel right," and he ran through the partly open gate. Someone from the car yelled something, but he did not remember what or know which person yelled. He then got shot. He heard one shot. The next he could remember, he was lying on the ground and Crockett was tying a shirt around his arms and leg. He did not see any guns and did not know who shot him.

Martha Alvarez, who lived in the 1200 block of Fernot Way, was outside with her three young children, who were playing on the sidewalk, when she heard shots from two guns. She turned and saw two hands outside the windows of a silver or gray car. The car went by "really fast" and turned on Connie Drive. She could not tell how many people were in the car or see their faces.

Around 3:00 p.m. on January 23, Tonya Navarro was walking near the corner of Connie Drive and Fernot Way as her two little daughters played in the area. She heard four or five gunshots from a four-door gray car that went by. There were two men inside, but she did not see their faces and could not tell their ethnicity. When the shots were fired, she thought she saw a hand with a gun sticking out the front passenger side window. She could not tell which person in the car pointed the gun. She saw the driver point out of the passenger side when the car went by after she heard the shots.

Jose Quinto was walking on Lassen when he saw Hernandez, a childhood friend he knew as Big C. Hernandez was "just chilling." As Quinto walked on, he heard gunshots. He ran back to find Hernandez on the ground, shot. Quinto called 911.

4

Cardoso was Quinto's cousin. Quinto saw him in a silver four-door car on Lassen on the day of the shooting. Quinto did not see if anyone else was with him.

At approximately 3:00 p.m. on January 23, Jose Mims was resting in his home in the 1200 block of Fernot Way when he heard six shots, one right after the other. Mims called the police.

Officer Ricks responded to Mims's residence to find Hernandez on the ground in the backyard. Tourniquets around Hernandez's right arm and leg were covered in blood, and he seemed to be going in and out of consciousness. He appeared to have multiple gunshot wounds. When Ricks asked if Hernandez knew who shot him, Hernandez said he was not sure, but there were two of them in a white two-door car.[8]

> FN [8]: All told, Hernandez was shot seven times in his right leg, right thigh, right arm, right shoulder, left shoulder, and right lower back. He underwent two operations. He was unable to walk and was confined to a wheelchair for almost three months, then had to use a walker for another month following the shooting.
>
> When Detective Lemos interviewed him at the hospital following the shooting, Hernandez related Cardoso had been in the driver's seat of the silver vehicle and Mendez in the front passenger seat. Hernandez said he had had problems with them in the past, including a physical fight about a year before the shooting. Hernandez said both defendants were laughing at him as they drove toward him. He thought they both had guns, but he did not actually see a gun.

Eight spent .380 shell casings were found in the roadway. There were nine bullet holes in the wooden fence that faced the street along the northeast corner of Mims's address. There were two more bullet holes in the back fence. Two wad cutters—a type of projectile mostly used for target shooting with a revolver—and two copper bullets were recovered from the fence and the yard. A copper bullet was found underneath Hernandez. One bullet entered the wood under the eve of the residence just above where Hernandez was lying.

On the evening of January 23, members of the Kings County Gang Task Force attempted to find defendants. Officer Perryman went to the area in which Mendez's mother reportedly lived. Seeing someone fitting Mendez's description, Perryman activated the emergency lights on his vehicle. Mendez stood where he was for a brief period as if surprised, then ran. There was a brief chase; Mendez attempted to run across a plowed dirt field, fell several times, and was taken into custody. A semiautomatic .380 handgun, chrome with black grips, was subsequently found on the ground near one of the places where Mendez had fallen. It had a round in the chamber and seven more rounds in the magazine. It was subsequently determined the spent cartridge casings found at the scene of the shooting were fired from this gun. The two wad cutters

found at the scene were not fired from this gun. It could not be determined whether the copper bullets had been.

On January 23, Detective Mathews viewed video recorded by a security camera mounted on a house on Connie Drive, near Fernot. The video depicted a four-door Honda Civic Hybrid arriving in the area. Shortly after, popping sounds could be heard. The same or a similar vehicle could then be seen leaving in the opposite direction at a high rate of speed.

Mathews checked the police department's record system and found a report of a stolen 2012 silver Honda Civic Hybrid. He had the dispatch center send a "be-on-the-lookout" for that vehicle. On the afternoon of January 24, he was notified the Lemoore Police Department had located the vehicle. Although no shell casings or other indications of gun use were found in the car, two prints from Cardoso's little finger were found on the right side of the rearview mirror inside the vehicle.[9]

> FN [9]: The car was stolen from outside Kim Harrison's residence in Hanford sometime in early January. Neither defendant had permission to use the vehicle.

None of the usable prints matched those of Mendez.

Police had a hard time finding Quinto, who finally came to the police station on his own on January 24. Mathews interviewed him that day. Quinto seemed angry at being put in such a situation, and concerned about his safety.

During the interview (the recording of which was played for the jury), Quinto related he had been walking from his mother's house on Connie Drive, when he saw "two dudes mugging" in a gray car. The two, who were White, asked if Quinto was Mexican and did he "bang." After asking him more questions, they said they were "fucking with" him, and he walked away. As they left, they put on some music, then he heard shots. Quinto ran back and saw Hernandez was on the ground, shot. Quinto called an ambulance and stayed with Hernandez until the police arrived.

Quinto initially denied knowing the people in the car. Eventually, however, he related his cousin, Cardoso, was one of them. Quinto stated he did not know the other person. When Quinto saw Cardoso, Quinto was at Lassen and Fernot. Cardoso yelled at him to get out of there.

Quinto admitted Cardoso and Hernandez had "been having a beef for a long time." Quinto was not sure, but thought "the beef" was over Rosales. Quinto said he had talked to Rosales the day before the shooting to ask why Cardoso was mad. Quinto had seen Cardoso a week before, and Cardoso and Hernandez had been "trippin on each other." When Cardoso pulled up on the day of the shooting and told Quinto to get out of there, Quinto knew something was going to happen. Quinto related that Cardoso was

driving the car, but he insisted he did not know the person with him and had never seen him before.

Quinto related that he was walking past the house where Hernandez was shot when he saw Hernandez. Hernandez was standing alone in front of the big gate in the alley. Quinto greeted him, then kept walking. He was a little past Lassen and Fernot when he saw Cardoso come from Connie and turn on Fernot. Cardoso pulled up and told Quinto to get out of there. Quinto was halfway down Lassen when he heard the gunshots and started running back.

Quinto told Mathews that he had never seen Cardoso with a gun, and did not see a gun that day. The car was gray and looked like a Focus. Quinto thought it had four doors. Cardoso was driving.

Quinto denied setting Hernandez up. He stated he did not know how Cardoso knew Hernandez was there. He did not know if Rosales might have told him; she and Quinto's sister were friends, and Quinto believed Rosales liked both Hernandez and Cardoso.

Mathews showed Quinto a single photograph of Cardoso. Quinto identified him as his cousin, who was driving the car. Mathews also showed him a photographic lineup that included Mendez's picture. Quinto was unable to identify anyone.

_The Gang Evidence_

Hernandez was never an actual member of a gang, but started associating with Northerners/Norteños when he was 14 years old. He had friends who were Northerners. He stopped associating with them about a year before trial, because he got tired of them. Although this made some of the Northerners in town angry and they would "[t]alk trash" to and about him, there had been no repercussions. When he associated with Northerners, he did not associate with either defendant, although he sometimes saw them around town.

Hernandez was not affiliated with any particular subset. He generally knew who the Northerners were in Hanford. He would say both defendants were Northerners.

Rosales thought Hernandez used to be a Northerner. She did not know if Cardoso was in a gang, but thought he and Hernandez "[p]ossibly" were in the same gang. Rosales told Mathews the conflict between Cardoso and Hernandez was "somewhat" a "gang thing." She did not recall, but may have told Mathews that Cardoso was a South Side Loc. She did not know if Mendez was a Norteño.

Officer Vallin of the Hanford Police Department testified as an expert on Kings County Norteño street gangs. He had been assigned as an investigator with the Kings County Gang Task Force for almost two years as of the time of trial. He had also had that assignment in 2008. He had received approximately 260 hours of formalized gang training, dealing with identification of gang members, documentation of gang members, trends in gangs and

their association, how to investigate gang-related crimes, and other related issues.

As a gang investigator, Vallin had investigated crimes committed by Norteños in Kings County. Those crimes included vandalism, homicides, attempted homicides, drive-by shootings, carjackings, vehicle thefts, and robberies. He had investigated crimes, including batteries, assaults, drive-by shootings, and stabbings, in which Norteños were victims. In the course of these investigations, he had opportunities to talk to Norteños who were suspects, victims, or witnesses. He also had consensual contacts with gang members and people in gang-infested neighborhoods. These types of contacts were made on a daily basis.

Vallin testified there were approximately 2,500 documented Norteño gang members and/or associates in Kings County as of the time of trial, and that Norteños were an ongoing gang with many rivals, including Sureños. Vallin explained Norteños associate with the color red and number 14. The number 14 represents the 14th letter of the alphabet—N—which stands for Norteño or Nuestra Familia. Nuestra Familia is the prison gang that is the overall authority with respect to the Norteño street gangs, all of which are subsets of the Nuestra Familia. Vallin explained that subsets are just different groups that fall under the Norteño umbrella. All the Norteño subsets in Kings County get along with each other, although Norteño subsets fight against each other in different parts of the state and country. In Hanford, the Norteño subsets are South Side Locs, Varrio Home Gardens (VHG), North Side Gangsters (NSG), and generalized Norteños who do not claim a specific subset but associate with different groups. Hernandez was an example of a generalized Norteño.

The primary activities of the Norteño criminal street gang include homicide, attempted homicide, felonious assaults, assaults with firearms, shooting at inhabited dwellings, robberies, and burglaries. For instance, on February 1, 2011, Ernesto Medina and two other South Side Loc gang members shot at a group they believed to be rival gang members, at 12th Avenue and Hanford Armona Road in Hanford.[10]

> FN [10]: Copies of various court documents, showing Medina's conviction for assault with a firearm, were admitted into evidence.

Vallin opined Medina was a Norteño criminal street gang member based on a vehicle stop that occurred June 26, 2008, in Hanford, in which Medina was noted to have one dot tattooed on one hand and four dots tattooed on the other hand (representing the number 14), and to be wearing a red hat and white tennis shoes with red laces. Vallin also relied on the fact Medina was booked into juvenile hall on June 13, 2008, at which time a threat assessment gang classification form was filled out and he was documented as a South Side Loc Norteño street gang member with the moniker "Ernie," as well as the fact that on April 14, 2009, he was ordered by the court to register as a gang member.

8

Vallin gave another example in which Steven Aguilar was arrested, on January 11, 2010, for shooting at a rival gang member at 10th Avenue and Myrtle Street in Hanford.[11]

> FN [11]: Copies of various court documents, showing Aguilar's conviction for assault with a firearm, were admitted into evidence.

Vallin opined Aguilar was a Norteño criminal street gang member based on several contacts. On February 12, 2003, Aguilar was booked into jail, and admitted being a South Side Loc gang member. On October 3, 2004, Aguilar was contacted by a sheriff's sergeant, who noted Aguilar had "14" tattooed under his eye.

With respect specifically to Cardoso, a threat assessment classification form was filled out when he was booked into jail, and jail staff documented him as a Norteño/Northerner. According to Vallin, gang members typically want to be placed with their fellow gang members, because they can conduct gang business and also for safety purposes. It could be dangerous for a gang member to be placed with a rival gang.

On August 20, 2008, Vallin investigated a stabbing in which David Williamson, Eric Zuniga, and Jennifer Williamson were arrested for stabbing Michael Garcia and Henry Turpin. Zuniga was a documented VHG gang member, and the Williamsons were also Norteño street gang members. During the course of the investigation, it was learned Cardoso, whose moniker was Squiddy, was also involved in the stabbing.[12]

> FN [12]: In Vallin's experience, VHG and South Side Locs tend to get along and commit crimes together.

When Cardoso was taken into custody on October 8, 2008, and booked into jail, he admitted he was a Norteño associate.

On January 25, 2013, Cardoso was booked into jail in connection with the present case. During the booking process, he admitted he was a Northerner while incarcerated, and a South Side Loc street gang member while "on the street."

Vallin opined Cardoso was a Norteño criminal street gang member. His opinion was based on all the contacts with Cardoso that Vallin had reviewed, Cardoso's self-admissions, his associations with other Norteño street gang members, and the criminal acts he committed with other Norteño street gang members.

***

With respect to testimony at trial that Hernandez was a dropout, Vallin explained a dropout is someone who is a gang member or associate but basically stops associating with the gang and "hangs it up." As the gang mentality is somewhat "blood in, blood out," gang members do not like it when people drop out. Because people within the gang are privy to information known only to gang

members, such as drug and gun transactions, who is on a hit list, who is considered no good, and how the gang's criminal enterprise works, someone defecting from a specific gang is not taken lightly by that gang. That person is now considered no good and may be subject to violent repercussions as a result. Norteño dropouts are viewed negatively by Norteños. Dropping out is seen as disrespecting the gang.

Vallin explained that disrespect played into the present case in a couple of ways. First, Hernandez disrespected the gang by dropping out. In addition, Hernandez was having relations with Rosales, who was possibly dating Cardoso. It showed disrespect to Cardoso that his girlfriend was having relations with a dropout from the gang Cardoso was with. It was also disrespectful to Cardoso that Hernandez choked Cardoso's girlfriend. According to Vallin, there are rules about Norteños not having sex with or disrespecting each other's girls. This rule is contained in the set of 14 bonds (rules) established by the Nuestra Familia, bond four of which states Norteños are not supposed to disrespect fellow Norteños. Violating that bond is supposed to lead to serious repercussions, which can mean a multitude of things in the gang lifestyle, including being beaten or murdered, or having family members hurt. If an individual like Cardoso is wronged and does not take action, he can be viewed as being weak and as "not being down" for the criminal gang enterprise itself. This could result in repercussions being taken against him by the gang.

Vallin was involved in an investigation that resulted in Hernandez going to prison for sales of methamphetamine. During the investigation, several grams of methamphetamine, together with weapons, were found during a search of Hernandez's residence. According to Vallin, one of the Norteños' enterprises was selling illegal narcotics. When gang members sell narcotics, they are expected to "pay taxes," meaning send part of their proceeds back to the gang, with that money in turn sent off to the gang hierarchy within the prison system. It was disrespectful to the Norteños that Hernandez was taking business away from the Norteños and not paying taxes, because he was a dropout. If the gang took no action against him, it would be considered weak by rival gang members.

Vallin opined the crimes in the present case were committed for the benefit of the Norteño criminal street gang. First, the crimes attempted to remove a dropout from their gang who was showing them disrespect. Taking him out violently sent a message to rival gangs, and also could hinder other gang members who were considering defecting. The acts were done in broad daylight, when there were people and even children around. The more fear gang members instill in citizens by committing such acts, the less likely citizens will be to call law enforcement, due to fear of retaliation. This allows the criminal street gang to conduct its business in broad daylight without fear of being reported. In addition, by committing the act, Cardoso's individual standing within the Norteño criminal street gang may have been enhanced, and he may now be viewed as someone who not just follows orders but also gives them, and who

10

is "down to do whatever" for the gang. Mendez's individual status could be benefited for the same reasons.

Vallin also opined the crimes were committed in association with a Norteño criminal street gang. Defendants are Norteño criminal street gang members and committed the crimes in association with each other.

(Doc. No. 14-7); *People v. Cardoso et al.*, No. F069505, 2016 WL 4249733, at *1-8 (omitting

facts relating only to Petitioner's co-defendant (Mendez)).

## II. APPLICABLE LAW

### A.  AEDPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state

custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v.*

*Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard in § 2254(d) permits relief on a

claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

*Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the

decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

U.S. at 419.  Habeas relief is proper only if the state court decision was "contrary to, or an

unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

11

governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

The federal court may review the claim based solely on the state-court record, see *Cullen v. Pinholster*, 563 U.S. 170, 180, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), and any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (Quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

As discussed earlier, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption

may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100.  This presumption applies whether the state court does not discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still decide the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

> When . . . there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102.  If such disagreement is possible, then the petitioner's claim must be denied. *Ibid*.

*Sexton*, 138 S. Ct. at 2558.

**B. Ineffective Assistance of Counsel**

A two-step analysis governs petitioner's ineffective assistance of counsel ground for relief. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Under the first prong of that test, the petitioner must prove that his attorney's representation fell below an objective standard of reasonableness. *Id*. at 687-88.  To demonstrate deficient performance, the petitioner must show his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687; *Williams v. Taylor*, 529 U.S. 362, 391

(2000).  In reviewing trial counsel's performance, however, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  Only if counsel's acts and omissions, examined within the context of all the circumstances, were outside the "wide range" of professionally competent assistance, will petitioner meet this initial burden.  *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986); *Strickland*, 466 U.S. at 689-90.

Under the second part of *Strickland's* two-prong test, the petitioner must show that he was prejudiced by counsel's deficient conduct.  466 U.S. at 694.  Prejudice is found where there is a reasonable probability that, but for his counsel's errors, the result would have been different.  *Id*.  The errors must not merely undermine confidence in the outcome of the trial but must result in a proceeding that was fundamentally unfair.  *Williams*, 529 U.S. at 393 n.17; *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  The petitioner must prove both deficient performance and prejudice.  A court need not, however, determine whether counsel's performance was deficient before deciding whether the petitioner suffered prejudice as the result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Richter*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (judicial review of counsel's representation is "doubly deferential when it is conducted through the lens of federal habeas").  When § 2254(d) applies, the "question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Richter*, 562 U.S. at 105.

### III.  ANALYSIS

**A.  Ground One: Ineffective Assistance of Counsel for Failure to Object**

For purposes of reviewing Petitioner's first ground for relief, the Court considers the last reasoned decision on Petitioner's claim—that of the California Court of Appeal.  Because the Court of Appeal rejected Petitioner's first claim on the merits, the deferential standard of § 2254

1    applies.

2                          **1.  Background**

3              Petitioner assigns constitutional error to trial counsel for failing to object to the

4    prosecutor's misstatement of the law related to the provocation/heat of passion doctrine[2] during

5    closing argument.  (Doc. No. 2 at 6).  On direct appeal, the Court of Appeal found portions of the

6    prosecutor's closing argument were legally incorrect.  The state court nonetheless disposed of this

7    ground on the deficiency ground because (1) the trial court properly instructed the jury on the

8    applicable law and (2) the jurors found Petitioner acted with premeditation and deliberation.

9    (Doc. No. 14-7 at 15-16).  Petitioner argues the state court decision was unreasonable because the

10   prosecutor's misstatement of the law "undermined the jury's ability to properly apply the

11   doctrine."  (Doc. No. 2 at 7-8).  In his traverse, Petitioner appears to re-frame this ground as part

12   of his cumulative error argument (discussed in ground four below).  Specifically, Petitioner

13   argues counsel's failure to object was just one of an "aggregate of effect of errors" regarding trial

14   counsel's failure to present a provocation defense that was ultimately "profoundly prejudicial."

15   (Doc. No. 18 at 34).  Petitioner even goes so far as to concede that the "prosecutor's improper

16   argument ultimately had no real impact on the jury's deliberations because Cardoso's own

17   attorney ignored the provocation defense altogether."  (*Id.*).  In an abundance of caution, the

18   Court still addresses this ground as a free-standing claim.

19             Respondent cites in full to the California Court of Appeal opinion denying Petitioner's

20   _____

       [2]

21            When a person attempts to kill while acting upon a sudden quarrel or in the heat of
              passion—even if exercising a sufficient "measure of thought ... to form ... an intent to
22            kill"—he or she acts with "a mental state that precludes the formation of malice." (*People
              v. Beltran* (2013) 56 Cal.4th 935, 942, 157 Cal.Rptr.3d 503, 301 P.3d 1120 (*Beltran*).)  A
23            person acts upon a sudden quarrel or in the heat of passion if his or her reason "was
              obscured or disturbed by passion to such an extent as would cause the ordinarily
24            reasonable person of average disposition to act rashly and without deliberation or
              reflection, and from such passion rather than from judgment." (*Ibid.*)  Thus, the offense
25            of attempted murder is reduced to the lesser included offense of attempted voluntary
              manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion.
26            (*People v. Williams* (1988) 199 Cal.App.3d 469, 475, 245 Cal.Rptr. 61; accord, *People v.
              Gutierrez* (2003) 112 Cal.App.4th 704, 708–709, 5 Cal.Rptr.3d 256.)

27
       *People v. Millbrook*, 222 Cal. App. 4th 1122, 1136–37 (2014).
28

1    relief on this claim. (Doc. No. 15 at 26-28).  Respondent argues the reasoning set forth by the

2    Court of Appeal properly concluded that Petitioner suffered no prejudice from trial counsel's

3    failure to object to the prosecutor's misstatement of law in the closing argument.  (*Id*. at 28).

4    After review of the record, the Court of Appeal concluded the prosecutor made a misstatement of

5    law during closing argument concerning provocation when offering an example of heat of passion

6    for the involutory manslaughter less offense.  The Court of Appeal further found that there was no

7    basis to find that an objection would have been futile, and an admonition would have cured the

8    harm.  ((Doc. No. 13-7); *People v. Cardoso et al.*, No. F069505, 2016 WL 4249733, at *8.  The

9    Court of Appeal, in analyzing this ground (and the other ineffective assistance of counsel claims)

10   correctly identified *Strickland* as the governing standard.  (*Id*.).   In finding trial counsel's failure

11   to object to the misstatement satisfied the deficiency prong, the Court of Appeal turned to the

12   prejudice prong and in relevant part held:

13          Accordingly, we turn to the question of prejudice. In this regard,
            "[i]t is not sufficient to show the alleged errors may have had some
14          conceivable effect on the trial's outcome; the defendant must
            demonstrate a 'reasonable probability' that absent the errors the
15          result would have been different. [Citations.]" (*People v.
            Mesa* (2006) 144 Cal.App.4th 1000, 1008.) This is the appropriate
16          standard, even if a different standard would have applied had
            defendants' direct claims of error not been forfeited. (*Id.* at pp.
17          1008-1009.)

18          Here, the trial court correctly instructed the jury on the applicable
            law. During the giving of instructions, it told jurors: "You must
19          follow the law as I explain it to you .... If you believe that the
            attorney's comments on the law conflict with my instructions, you
20          must follow my instructions. Pay careful attention to all of these
            instructions ...." Just before the prosecutor's opening argument, the
21          trial court reminded jurors: "And if either attorney misstates the
            evidence or the law, you will rely on the evidence as presented in
22          the trial, and the law as stated by me." We presume jurors followed
            these instructions. (*People v. Speight* (2014) 227 Cal.App.4th 1229,
23          1242; *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268-
            1269; *People v. Najera, supra*, 138 Cal.App.4th at p. 224;
24          see *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9; but
            see *People v. Centeno, supra*, 60 Cal.4th at pp. 676-677 [where
25          prosecutor's incorrect hypothetical did not directly contradict trial
            court's instruction, jury had no reason to reject hypothetical].)
26
            In addition, jurors found defendants acted with premeditation and
27          deliberation. "This state of mind, involving planning and deliberate
            action, is manifestly inconsistent with having acted under the heat
28          of passion—even if that state of mind was achieved after a

16

considerable period of provocatory conduct ...." (*People v. Wharton* (1991) 53 Cal.3d 522, 572; see *People v. Peau* (2015) 236 Cal.App.4th 823, 831-832.)

Under the circumstances, we conclude defendants have failed to establish prejudice. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 702-703.)

(Doc. No. 13-7); *People v. Cardoso et al.*, No. F069505, 2016 WL 4249733, at *8-9, 11.

## 2. Petitioner is Not Entitled to Relief on Ground One

Petitioner does not show that the Court of Appeal's decision was contrary to, or an unreasonable application of *Strickland* or based on an unreasonable determination of facts in light of the evidence presented. The record reflects the trial court properly instructed the jury on the correct provocation/heat of passion law before closing argument, and further included the admonition that "if either attorney misstates the evidence or the law, you will rely on the evidence as presented at trial, and the law as stated by me." (Doc. No. 14-7 at 16; Doc. No. 12-13 at 13, 49). The jury is presumed to have followed such instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974) (noting a repeated misrepresentation of evidence can "have a significant impact on the jury's deliberations," but an isolated passage in a prosecutor's closing argument, billed in advance "as a matter of opinion and not of evidence," does not generally reach those proportions).

Further, after being properly instructed on provocation/heat passion by the trial court, the jury found Cardoso acted with premeditation and deliberation, which is "manifestly inconsistent with having acted under the heat of passion – even if that state of mind as achieved after a considerable amount of provocatory conduct . . .." (Doc. No. 14-7 at 16, *Cardoso*, 2016 WL 4249733, at *12 (citing *People v. Wharton*, 53 Cal. 3d 522, 572 (1991)). Thus, the jury necessarily found premeditation and deliberation when it convicted Petitioner of attempted murder, and such a finding by the jury is inconsistent with the theory of acting in the heat of passion. Consequently, there is no reasonable likelihood that the jury would have returned a favorable verdict if trial counsel had objected to the prosecutor's misstatement of the law as to provocation/heat of passion during closing argument. *See Trimble v. Swartout*, 2015 WL

17

1   2448558 (E.D. Cal. May 20, 2015) (given the "common sense notion that provocation is the sort

2   of phenomenon that would affect how deliberate and premediated a subsequent action" is, the

3   Court of Appeal was not unreasonable in concluding the jury necessarily considered provocation

4   when it found Petitioner's actions were willful, deliberate and premeditated and that a more

5   specific jury instruction would not have changed the outcome of the proceedings).

6          Based on the foregoing, the Court of Appeal's rejection of Petitioner's ineffective

7   assistance of counsel claim on *Strickland's* deficiency prong was not contrary to, or an

8   unreasonable application of clearly established federal law or an unreasonable determination of

9   facts in light of the evidence presented.  The undersigned recommends ground one of the Petition

10  be denied.

11         **B.  Ground Two: Ineffective Assistance of Counsel for Failure to Investigate and**

12              **Present a Provocation Defense**

13         For purposes of reviewing Petitioner's second ground for relief, the Court considers the

14  last reasoned decision on Petitioner's claim—that of the California Superior Court.  Because the

15  Superior Court rejected Petitioner's second claim on the merits, the deferential standard of § 2254

16  applies.

17              **1.  Background**

18         Petitioner assigns constitutional error to his trial counsel for not investigating and

19  presenting a provocation/heat of passion defense.  (Doc. No. 2 at 8-15).  Petitioner argues a

20  "guilty verdict was a foregone conclusion" when trial counsel presented the defense that

21  Petitioner was not present at the time of the shooting despite several eyewitnesses, including the

22  victim and Petitioner's cousin, placing Petitioner at the scene of the shooting as the driver of a

23  silver car similar to video footage of the suspect's vehicle; fingerprints belonging to Petitioner

24  recovered in a stolen car matching the car in video footage recovered the day after the shooting;

25  the recovery of a gun, apparently dropped by Petitioner's co-defendant, that forensics showed to

26  have been one of two firearms used in the shooting; and the presentation of evidence that

27  Petitioner had gang-related motives to shoot the victim.  (*Id*. at 8-9 (also contending trial counsel

28  did not present evidence of an alibi or offer any rebuttal of eyewitness testimony, forensic

18

evidence, or gang evidence)).  Petitioner argues trial counsel did not fully investigate the case fully to uncover the full history of the hostility of the victim toward Petitioner, including previous assault with a vehicle, threatening him with guns, and shooting at him on one occasion.  (*Id*. at 10).  Petitioner notes Petitioner's girlfriend at the time, Anissa Rosales, who was the only witness who had knowledge of the victim's violent history toward Petitioner, was not "utilized in the service of a provocation defense" and trial counsel "even urged the jury to disregard [her] testimony, suggesting she was the actual culprit." (*Id*.).  Finally, Petitioner points to the fact that trial counsel made no reference to the provocation/heat of passion defense in closing, despite the trial court's *sua sponte* instructing the jury on the lesser included offense over the prosecutions' objection.  (*Id*.).

Petitioner points to testimony at the evidentiary hearing by trial counsel, the investigator and Anissa Rosales in support of his claim and argues the Superior Court improperly applied the *Strickland* standard.  (*Id*. at 13).  Specifically, Petitioner argues the Superior Court's reliance on Rosales' trial testimony "ignores" the omission of "the most salient acts" of the victim's violence toward Petitioner and the trial court's admonition to the jury to "disregard" her testimony, which was particularly important to prove a pattern of violence by the victim over a period of time. (*Id*.).  Petitioner also contends that, despite the trial court's instruction regarding provocation/heat of passion, trial counsel's failure to mention it during closing meant "there is virtually no way the jury could have seized upon it during deliberations," and as argued above, trial counsel failed to object to the prosecution's misstatement of the law in closing statements "or to meet it with contrary argument." (*Id*. at 13-14).

In its Answer, Respondent cites in full the California Superior Court opinion finding on the merits that trial counsel was not ineffective for failing to investigate and present a provocation/heat of passion.  (Doc. No. 15 at 29-31).  Respondent argues the Superior Court's reasonably concluded that (1) trial counsel's performance was not deficient because there is a reasonable argument that trial counsel reasonably selected the mistaken-identity defense with which the provocation/heat of passion defense was in direct conflict; and (2) Petitioner did not suffer meaningful prejudice because there was no evidence that Petitioner was in the "heat of

passion" at the time of the shooting so there was no evidence of "sufficient provocation" to infer the duration of Petitioner's alleged "heat of passion." (*Id*. at 31-39).

### 2. Superior Court Decision

The Kings County Superior Court granted Petitioner an evidentiary hearing on his state petition for writ of habeas corpus "to resolve material evidentiary conflicts raised by the pleadings" as to whether trial attorney conducted a sufficient pretrial investigation and as to facts and witnesses to support a provocation defense. (Doc. No. 14-11 at 1). On April 19, 2019, the Superior Court denied Petitioner's state habeas petition. (Doc. No. 14-11). The Superior Court correctly identified *Strickland* as the governing law in evaluating Petitioner's ineffective assistance of counsel claim and recognized that a defense counsel's tactical decisions are to be afforded "great deference." (Doc. No. 14-11 at 2).

At the evidentiary hearing, trial counsel, Mr. Trevino, testified Petitioner refused to waive time and discussed with him the disadvantages regarding the same. (EH at 21:16-16; 22:6). Trevino met with Petitioner a few times in jail. (EH at 22:19). Trevino selected his theory of the defense during a meeting at the jail in which Petitioner denied being present at the incident. (EH at 23: 9-12). Petitioner asserted his innocence on several occasions and Trevino believed his client. (EH at 38: 28; 39: 1-2). Trevino employed an investigator, Mr. Brian Pinto, to investigate witnesses for the defense and secured funding via court order for twenty-five (25) hours of investigation time. (EH at 26: 2 -29: 27; Exhibit 4). Pinto conducted interviews with Mr. Christian Hernandez ("victim") and a witness, Ms. Anita Avila (Petitioner's mother). (Exhibit 6; EH at 34: 8-9). The investigative report contains statements by Ms. Avila that she was aware of issues between her son and the victim over a female, Ms. Anisa Rosales. (Exhibit 6). The report contained similar statements by the victim. (*Id*.). Trevino confirmed it would have been his custom and practice to pass along any information about the victim, Petitioner, and Ms. Rosales to his investigator. (EH at 65: 20-25). Trevino was aware the defense investigative report contained witness statements of tension between Petitioner and the victim. (EH at 37:17-24). Trevino did not file any pretrial motions and he only identified Petitioner, who did not testify, as a witness on his witness list. (EH at 42: 4-6; 43: 6-11). Trevino selected the defense theory in the

1    face of the following evidence: the victim identifying Petitioner as the driver of the car at the

2    scene; Petitioner's cousin identifying Petitioner in the vicinity of the scene before the shooting;

3    ballistics evidence linking a weapon found near Petitioner's co-defendant to the shooting; and, the

4    recovery of Petitioner's fingerprints from the rear-view mirror of the stolen vehicle matching the

5    surveillance footage recovered the day after the shooting. (EH at 64: 5-22).  Trevino focused his

6    closing argument on the inconsistencies in the testimony surrounding the vehicle at the scene and

7    did not recall mentioning provocation during his closing argument. (EH at 75: 6-10; 23-25).

8    Trevino opted not to utilize a provocation defense because it meant conceding Petitioner

9    committed the shooting – which was the opposite of the defense theory. (EH at 76: 5-15.)

10          Defense Investigator, Mr. Pinto, also testified at the evidentiary hearing. During a pretrial

11   Interview with Petitioner, Petitioner told Pinot he was not involved in the incident. (EH at 113:

12   10-13).  After consulting with Trevino, Pinto sought out Ms. Rosales as an important alibi

13   witness. (EH at 113:27-28; 114:1-4).  Pinto spent eight hours looking for Ms. Rosales but did not

14   find her until the day of trial but was then able to talk to her for an hour. (EH at 114:19-28; 114:1-

15   6).  In the time leading up to the trial, Pinto conducted surveillance on Rosales' residence, but not

16   her place of employment because he did not know where she worked. (EH at 115:18-28.) He

17   made six attempts to contact Rosales to no avail. (EH at 127:6-9).  Pinto interviewed the victim,

18   who identified Petitioner as a participant in the shooting and provided Rosales as a possible

19   motive. (EH at 117:4-16).  Pinto did not investigate prior incidents of violence between Petitioner

20   and the victim or whether Petitioner was a Norteno. (EH at 119:14-20).  After Pinto exhausted

21   twenty-four (24) hours of investigation time, he and Trevino did not discuss extending

22   investigative efforts because Petitioner refused to waive time.  (EH at 120:4-25).  Pinto admitted

23   he did not attempt to locate and interview all 22 witnesses Trevino supplied him.  (EH at 122:1-

24   7).  Pinto said he was "stonewalled" by multiple potential witnesses, including, Mr. Jose Quinto

25   and Elijah Crockett. (EH at 125:11-28; 126: 1-19).

26          In denying this ground, the state Superior Court in relevant part found:

27          Even assuming the foregoing evidence supports Petitioner's
            position that Mr. Trevino's trial preparation efforts fell below an
28          objective standard of reasonableness under prevailing professional

norms, Petitioner has failed to show by a preponderance of the evidence that he was prejudiced by the deficient efforts. Regardless of which party requested CALCRIM 603 (Attempted Voluntary Manslaughter/Heat of Passion], it was provided to the jury. (RT, Jury Trial. June 4, 2013, 25: 8-28; 26: 1-28, 27: 1-9.) Mr. Trevino- not the prosecutor- elicited testimony from Ms. Rosales upon cross examination about several violent acts perpetrated against the Petitioner by the victim.

Ms. Rosales testified at trial about how she heard the victim repeatedly state he wanted Petitioner dead. (RT, Jury Trial June 3, 2013, 87: 15-18.) She testified that the victim broke down the door to her home when Petitioner was inside with her. (RT, Jury Trial June 3, 2013, 91: 15-18.) Mr. Trevino asked Ms. Rosales about other incidents, and she testified that the victim ran Petitioner over with a car. (RT, Jury Trial June 3, 2013, 91:19-21.) Mr. Trevino elicited testimony from Ms. Rosales that the night before the shooting, the victim became enraged and violently attacked her after he suspected Petitioner knocked on her bedroom window. (RT, Jury Trial June 3, 2013, 95: 11 -28; 96: 1-28.) She testified that the victim was a violent person Who carried a gun and was the one who had a problem with Petitioner, not the other way around. (RT, Jury Trial June 3, 201 3, 90: 1 6-18; 91: 14.)

In addition to evidence of the victim's violence and hatred of Petitioner being presented to the jury, the prosecutor dedicated a large portion of her closing argument to negating the idea that Petitioner was guilty of manslaughter because he was provoked by the victim's violent acts. The jury was aware of and had an opportunity to consider the idea that Petitioner was provoked by the victim. Accordingly, Petitioner cannot successfully claim he was prejudiced by Mr. Trevino's deficient investigation or decision not to present this theory of defense at trial.

Furthermore, and perhaps most relevant, it appears from the record that Mr. Trevino made an informed choice of trial tactic in advancing the defense theory that Petitioner did not take part in the shooting. He testified he was aware of defense investigative reports outlining tension between Petitioner and the victim over their common love interest, Ms. Rosales. Despite these, he believed his client's representation that he did not do it. Pursuing a provocation theory would not have furthered this defense; in fact, it would have required conceding that Petitioner shot the victim. Additionally, pursuing a provocation defense would have surely required Petitioner to take the stand regarding his state of mind at the time of the shooting. All testimony presented at the evidentiary hearing is that Petitioner's position at the time was that he was not involved in the shooting.

Mr. Trevino's trial tactic was to focus on inconsistencies in the evidence regarding the vehicle involved in the shooting due to repeated denials of involvement by Petitioner. Namely, the owner of the stolen vehicle testified that it was a two-door vehicle with non-tinted windows. (RT, Jury Trial May 29, 2013, 45: 1 13.) Yet several other prosecution witnesses described it as a four door with

1

2

3

> tinted windows, just as the partial surveillance footage depicted.
> Since the record shows a rational tactical purpose behind trial
> council's decision not to pursue a provocation defense, there are no
> grounds for habeas corpus relief. (*People v. Fosselman* (1983) 33
> Cal.3d 572, 582.)

4    (Doc. No. 14-11 at 2-6)

5               **3.   Petitioner is not Entitled to Relief on Ground Two**

6            The undersigned cannot conclude that the Superior Court was objectively unreasonable in

7    finding the record shows an informed, tactical purpose behind trial council's decision not to

8    pursue a provocation defense.  "There is a 'strong presumption' that counsel's attention to certain

9    issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  *Harrington v.*

10   *Richter*, 562 U.S. 86, 109 (2011); *see also Hughes v. Borg,* 898 F.2d 695, 702 (9th Cir. 1990)

11   (citing *Strickland,* 466 U.S. at 689) ("We strongly presume that counsel's conduct was within the

12   wide range of reasonable assistance, and that he exercised acceptable professional judgment in all

13   significant decisions made.").  Trial counsel testified at the evidentiary hearing that although he

14   was aware of defense investigative reports regarding "tension" between the victim and Petitioner

15   over Rosales, their common love interest, he believed his client's repeated statements that he was

16   not involved in the shooting.  (Doc. No. 14-12 at 149-50, 175, 186, 203).  Trial counsel based his

17   defense strategy on inconsistencies between the owner of the stolen car's testimony that it was a

18   two-door car with non-tinted windows, and eyewitness descriptions that it was a four-door car

19   with tinted windows, as depicted in surveillance footage.  (Doc. No. 14-11 at 6; Doc. No. 14-12 at

20   186).  While Petitioner takes issue with trial council's decision not proceed on this defense

21   strategy despite "overwhelming evidence" that Petitioner participated in the shooting (Doc. No. 2

22   at 8; Doc. No. 18 at 36), clearly established law recognizes that "[t]he reasonableness of counsel's

23   actions may be determined or substantially influenced by the defendant's own statements or

24   actions," and "what investigation decisions are reasonable depends critically on that information."

25   (Doc. No. 15 at 33 (citing *Strickland*, 466 U.S. at 691)); *Stankewitz v. Woodford*, 365 F.3d 706,

26   719 n.7 (9th Cir. 2004) ("An attorney's performance is not deficient where, as here, it reflects a

27   reasonable strategic choice that aligns with his client's wishes."); *Webster v. Chappell*, 2014 WL

28   2526857, at *83 (E.D. Cal June 4, 2014) ("A defense attorney may rely on his client's statements

1    and preferences in choosing a defense of alibi, self-defense or innocence over a defense based on

2    some type of mental impairment.").

3         Additionally, as emphasized by the Superior Court decision, "[p]ursuing a provocation

4    theory would not have furthered his defense; in fact, it would have required conceding that

5    Petitioner shot the victim" and it would have required that Petitioner take the stand regarding his

6    state of mind at the time of the shooting, when "[a]ll testimony presented at the evidentiary

7    hearing is that Petitioner's position at the time was that he was not involved in the shooting."

8    (Doc. No. 14-11 at 6).  It is well-settled that counsel cannot be faulted for deciding not to pursue

9    inconsistent defenses.  *See Doe v. Woodford*, 508 F.3d 53, 569 (9th Cir. 2007); *Williams v.*

10   *Woodford*, 384 F.3d 567, 611 (9th Cir. 2004) (after selecting a reasonable defense, counsel no

11   longer has a duty to investigate conflicting defenses).  Similarly, based on Petitioner's

12   representations and the "stonewalling" by witnesses during investigation (*See* Doc. No. 14-12 at

13   201, 237-38), trial counsel may have "had good reason to doubt there was anything he could do to

14   transmute the evidence of 'tension between' Petitioner and the victim into anything other than

15   incriminating motive evidence."  (Doc. No. 15 at 35); *Knowles v. Mirzayance*, 556 U.S. 111, 127

16   (2009) ("The law does not require counsel to raise every available nonfrivolous defense" or "to

17   have a tactical reason – above and beyond a reasonable appraisal of a claim's dismal prospects for

18   success" – not to pursue it); *Bean v. Calderon*, 163 F.3d 1073, 1082-83 (9th Cir. 1998) (rejecting

19   claim that trial counsel was ineffective for failing to present and investigate a defense theory that

20   lacked support from the record and was in conflict with other evidence).

21        Based on the foregoing, Petitioner has not overcome the strong presumption that trial

22   counsel made an informed and tactical decision not to pursue a provocation/heat of passion

23   defense.  *See Harrington*, 562 U.S. at 109.  It was not objectively unreasonable for the Superior

24   Court to conclude that trial counsel's performance was not deficient.

25        Petitioner additionally argues at length that trial counsel did not conduct a reasonable

26   investigation into the viability of a provocation/heat of passion defense, and there was a

27   reasonable probability that the outcome of the trial would have been different had trial counsel

28   mounted a provocation/heat of passion defense.  (*See, e.g.,* Doc. No. 18 at 42-54).  Defense

24

counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691.  However, "the duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed." *Hendricks v. Calderon,* 70 F.3d 1032, 1040 (9th Cir. 1995). Of particular note here, trial counsel and the investigator testified at the evidentiary hearing that they were "stonewalled" in their investigation attempts, and there was no evidence that Petitioner knew the victim had attacked Rosales the night before the shooting, evidence which would presumably be significant in determining whether to present a provocation/heat of passion defense.  (Doc. 14-12 at 201 (trial counsel testified witnesses "didn't want to get involved"), 210 (trial counsel testified he did not believe there was evidence Petitioner knew of attack), 237-38, 289-90 (Rosales testified she would not have told Petitioner about attack)).

Regardless, as held by the Superior Court, "[e]ven assuming the [evidence presented at the evidentiary hearing] supports Petitioner's position that [trial counsel's] preparation efforts fell below an objective standard of reasonableness under prevailing professional norms, Petitioner has failed to show by a preponderance of the evidence that he was *prejudiced* by the deficient efforts." (Doc. No. 14-11 at 5) (emphasis in original).  In support of this finding, the Superior Court noted that the jury was instructed on CALCRIM 603 [Attempted Voluntary Manslaughter/Heat of Passion].  (*Id*.).  The Superior Court noted it was trial counsel, not the prosecutor, who elicited testimony from Rosales at trial as to violent acts by the victim toward Petitioner, including repeated statements that he wanted Petitioner dead, breaking down the door to her home when Petitioner was with her, running Petitioner over with a car, and carrying a gun. (*Id*.).  Trial counsel also elicited testimony from Rosales that the night before the shooting the victim violently attacked her because he suspected Petitioner had knocked on her window.  (*Id*.). Finally, a "large portion" of the prosecutor's closing argument focused on negating the theory that Petitioner was guilty of the lesser offense of manslaughter because he was provoked by the victim's violent acts.  (*Id*. at 5-6).

Petitioner argues Rosales' testimony did not include other instances of violence toward Petitioner by the victim, including shooting at him, which together show a pattern of violence

toward Petitioner; and that despite her testimony trial counsel failed to "meaningfully explore" the victim's history of violence toward Petitioner.  (Doc. No. 18 at 39-40).  Petitioner also generally asserts it is "absurd" to rely on the prosecutor's closing argument to compensate for trial counsel's failure to investigate and present a provocation defense, particularly in light of the prosecutor's misstatement of the law regarding the heat-of-passion defense, as discussed in detail above.  (*Id*. at 41-42).  However, as noted by the Superior Court, the jury heard testimony concerning the victim's violent history toward Petitioner elicited by trial counsel, heard correct instructions by the court as to the lesser offense by the trial court, and heard arguments from the prosecutor as to a potential theory of provocation based on a history of victim's violent acts toward Petitioner.  Thus, the Superior Court determined it could not be found that there is a reasonable probability that, but for trial counsel's failure to present a defense based on provocation/heat of passion, the result of the proceeding would have been different.  *See Strickland*, 466 U.S. at 694; *Mickey v. Ayers*, 606 F.3d 1223, 1236-37 (9th Cir. 2010) ("[T]he test for prejudice is whether the noninvestigated evidence was powerful enough to establish a probability that a reasonable attorney would decide to present it and a probability that such presentation might undermine the jury verdict.").

Based on the foregoing, the Court finds that the Superior Court's decision was not contrary to, or an unreasonable determination of, clearly established law, nor is it based on an unreasonable determination of the facts in light of the evidence presented.  Its ruling that Petitioner did not show deficient performance or prejudice as a result of trial counsel's failure to investigate and present a provocation/heat of passion defense is "not so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.  Thus, the undersigned recommends ground two of the Petition be denied.

### C.  Ground Three: Ineffective Assistance of Counsel for Failure to Consult With or Call as a Witness a Defense Gang Expert

For purposes of reviewing Petitioner's third ground for relief, the Court considers the last reasoned decision on Petitioner's claim—that of the California Superior Court.  Because the

1   Superior Court rejected Petitioner's third claim on the merits, the deferential standard of § 2254

2   applies.

3                               **1.   Background**

4           At trial, the prosecution presented expert witness testimony from Hanford Police

5   Detective Justin Vallin about both Petitioner's and the victim's involvement in a Norteño street

6   gang.  Petitioner argues this evidence was used to show Petitioner was motivated to shoot the

7   victim because he was a dropout and was selling drugs without permission from the gang; and to

8   preemptively contain any defense argument that the shooting was an emotional response to the

9   victim's assault on Rosales.  (Doc. No. 2 at 16-17).  Petitioner faults trial counsel for not

10  consulting or calling a gang expert as a witness to undermine the prosecutor's argument that

11  Petitioner had gang-related motives for shooting the victim, as opposed to acting in the heat of

12  passion.  (*Id*. at 18).  At the evidentiary hearing, Petitioner presented testimony from Gabriel

13  Virrueta, a private investigator who formerly worked as a peace officer and gang investigator.

14  Virrueta testified that despite Petitioner's "booking statement" that he was a "Northerner"[3] this

15  was not "robust evidence" of gang membership because his association was a survival strategy;

16  and contrary to the trial testimony of Detective Vallin, the connection between prison gangs and

17  street level gangs is more attenuated.  (Doc. No. 18 at 55-56; Doc. No. 14-12 at 328-58).

18          In its Answer, Respondent cites in full to the California Superior Court opinion denying

19  the ground on the merits.  (Doc. No. 15 at 39-40).  Respondent argues Petitioner provides no

20  evidence or argument that the Superior Court's decision finding trial counsel made a rational,

21  tactical decision not to call a gang expert based on his prior experience because their expertise is

22  not unique to Kings County and would be detrimental to the case was unreasonable.  (Doc. No.

23  15 at 40-41; Doc. No. 14-11 at 6).  Respondent also argues Petitioner cannot overcome the

24  finding by the Superior Court on the deficiency prong because the gang expert who testified at the

25  evidentiary hearing would not qualify as an expert witness under current legal authority, and the

26  _____

27  [3] As noted in the Petition, on direct appeal, Petitioner successfully argued that the gang enhancement was
    improper because Det. Vallin based his opinion on statements taken in violation of *Miranda v. Arizona*,
    384 U.S. 436 (1966) when Petitioner was booked into custody.  (Doc. No. 2 at 16; Doc. No. 14-7 at 25-

28  29).

proffered expert's testimony would have been excluded as unreliable due to lack of training, experience, and personal knowledge in Kings County criminal street gangs.  (Doc. No. 15 at 41-42).

### 2.  State Court Decision

In addition to the issues raised in ground two, the Superior Court held an evidentiary hearing "to resolve material evidentiary conflicts raised by the pleadings" concerning whether Petitioner's trial attorney "determined the need to contact and/or consult a gang expert witness to testify on behalf of the defense."  (Doc. No. 14-11 at 2).  The Superior Court denied Petitioner's relief on this ground.  (*See generally* Doc. No. 14-11).

At the evidentiary hearing, trial counsel, Mr. Trevino, testified that he opted not to consult an expert witness for the gang enhancements based on prior experience.  Trevino explained that their expertise is not unique to Kings County and instead is based on gang structures outside of the locality, such as Los Angeles or Fresno, which would have been detrimental to the case.  (EH at 89:28; 90:1-11).

Petitioner offered the testimony of Mr. Gabriel Virrueta to support his claim.  Virrueta is a private investigator and previously worked as a peace officer performing inmate gang classifications for the California Department of Corrections and Rehabilitation.  Virrueta had generalized knowledge of the Norteno and Nurrieta Familia gang structures but admitted he had no specific knowledge of the activities of South Side Locs or North Side Gangsters between the years of 1995 and 2003.  (EH at 233, 90:11-20).  Virrueta had trouble explaining the legal definition of a street gang as defined in California Penal Code section 186.22(f). (EH at 244, 90:20-28; 245 1-25).  Indeed, the Superior Court found Virrueta made misrepresentations about his prior gang task force and expert witness experience during his testimony. (EH at 239:24-26; 240: 3-10; 243: 17-22; 245 1-25).

The Superior Court in denying Petitioner relief on this ground, found in relevant part:

> Mr. Virrueta would certainly not qualify as a gang expert under the current goalpost of *People v. Prunty* (2015) 62 Cal.4th 59 and the admissibility standard of *People v. Sanchez* (2016) 63 Cal.4th 665. Moreover, Mr. Virrueta's testimony would have been properly excluded as unreliable in 2013 due to a lack of training, experience,

and personal knowledge in Kings County criminal street gangs.
(*People v. Price* (1991) 1 Cal.4th 324.)

The evidence before this court reflects that Mr. Trevino made a rational, tactical decision not to consult with or call a gang expert to contradict testimony provided by Detective Vallin. Even assuming it was deficient representation not to consult a gang expert, Petitioner has failed to demonstrate the second – and most important – prong of the ineffective assistance of counsel analysis: *prejudice*. Petitioner has failed to demonstrate that the testimony offered by an available defense gang expert would have even been admissible at trial. (*People v. Adkins* (2002) Cal.App.4th 942 [trial attorney not remiss in not presenting additional expert testimony there is no cause to suspect the evidence would have led to a different conclusion].)

Doc. No. 14-11 at 6-7

### 3.   Petitioner is Not Entitled to Relief on Ground Three

Petitioner fails to overcome the presumption that not retaining a gang expert was a strategic decision, particularly in light of the defense theory that Petitioner did not participate in the shooting. *See United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995) ("[T]he defendant must surmount the presumption that, 'under the circumstances, the challenged action might be considered sound trial strategy.'" (Quoting *Strickland*, 466 U.S. at 689); *Harrington*, 562 U.S. at 106-07 (deferring to counsel's decision not to hire an expert because counsel was entitled to "formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."). Trial counsel does not have to retain an expert even if the prosecution opts to do so. *Harrington,* 562 U.S. at 110 ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense . . . ."); *Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995) ("[W]hile the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense."). Trial counsel offered strategic reasons, based on his previous experience, for not consulting an expert witness for the gang enhancements at the evidentiary hearing. (Doc. No. 14-11 at 6; Doc. No. 14-12 at 200-01). Trial counsel explained that expertise, which is not unique to Kings County but is based on gang structures in places such

29

1   as Los Angeles or Fresno, would have been detrimental to the case.  (*Id.*).  Thus, the Superior

2   Court reasonably concluded that trial counsel made a rational, tactical decision not to consult with

3   or call a gang expert.

4        In addition to finding Petitioner did not demonstrate deficiency by trial counsel, the

5   Superior Court determined Petitioner "failed to demonstrate the second – and most important –

6   prong of the ineffective assistance of counsel analysis: *prejudice*."  (Doc. 14-1 at 7 (emphasis in

7   original)).  Petitioner argues the Superior Court's reliance on *People v Prunty*, 62 Cal. 4th 59

8   (2015) and *People v. Sanchez*, 63 Cal. 4th (2016) in finding the gang expert identified by

9   Petitioner at the evidentiary hearing would not be admissible is "misplaced" for several reasons.

10   (Doc. No. 18 at 57-59).  However, regardless of whether those cases are distinguishable, a claim

11   of prejudice stemming from counsel's failure to call an expert witness must be supported by

12   evidence sufficient to create a reasonable probability that the jury would have had a reasonable

13   doubt concerning Petitioner's guilt.  *See Tinsley v. Borg*, 895 F.2d 520, 532 (9th Cir. 1990).  "To

14   succeed on a claim that counsel was ineffective in failing to call a favorable witness, a federal

15   habeas petitioner must identify the witness, provide the testimony the witness would have given,

16   show the witness was likely to have been able to testify and would have given the proffered

17   favorable testimony, and demonstrate a reasonable probability that, had such testimony been

18   introduced, the jury would have reached a verdict more favorable to the petitioner."  *Young v.

19   Gipson*, 163 F. Supp. 3d 647, 688 (N.D. Cal. 2015).

20        The Superior Court opined that Virrueta's testimony would have been properly excluded

21   as unreliable based on his lack of training, experience, and personal knowledge of street gangs in

22   Kings County.  (Doc. No. 14-11 at 7 (citing Doc. No. 14-12 at 345-47 (Virrueta's testimony

23   acknowledging that trial counsel "could run into problems if he were to put a gang expert up there

24   and it were to come out during his or her testimony that they did not have the requisite expertise

25   in South Side Locs or North Side Gangsters"), 351-56 (Virrueta's testimony that he did not know

26   the parameters of the streets that define the Norteño neighborhood), 356 (Virrueta had trouble

27   explaining the legal definition of a street gang)).  Indeed, Petitioner concedes that the Superior

28   Court "justifiably took issue with some of the [sic] Virrueta's claims regarding his expertise."

(Doc. No. 2 at 18) (arguing that "underlying points he made in his testimony remain relevant" regardless of his qualifications).  Regardless of whether Virrueta's proffered testimony would have been permitted, Petitioner cannot meet the deficiency prong due to trial counsel's tactical decision. Based on the foregoing, Petitioner has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2).  Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, ground three of the Petition should be denied.

### D.  Ground Four: Cumulative Error

#### 1.  Background

As his fourth and final ground, Petitioner argues that the cumulative impact of trial counsel's errors, as discussed *supra*, resulted in denial of Petitioner's right to effective assistance of counsel.  (Doc. No. 2 at 19-21).

#### 2.  Petitioner is Not Entitled to Relief on Ground Four

"Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant."  *Cook v. Kernan*, 801 F. App'x 474, 477 (9th Cir. 2020) (internal quotations and citations omitted).  The cumulative error, however, "must render the trial and sentencing fundamentally unfair."  *Id*. (citations omitted).  Absent a finding of any error on any of the preceding grounds, the Court cannot find cumulative error.  *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018) (a court "cannot consider the cumulative effect of *non*-errors."); *see also* *McGill v. Shinn*, 16 F.4th 666, 684 (9th Cir. 2021), cert. denied, 214 L. Ed. 2d 236, 143 S. Ct. 429 (2022).

Because the undersigned finds none of Petitioner's ineffective assistance of counsel claims have merit, the undersigned concludes Petitioner cannot show his conviction was fundamentally unfair nor a "unique symmetry" of harmless errors that "amplify each other in relation to a key contested issue in the case."  *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).  Thus, ground four is without merit and should be denied.

1  ## IV.  CERTIFICATE OF APPEALABIILTY

2        A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

3  court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

4  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

5  district court to issue or deny a certificate of appealability when entering a final order adverse to a

6  petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

7  Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

8  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

9  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

10  his constitutional claims or that jurists could conclude the issues presented are adequate to

11  deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

12  *McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the

13  denial of a constitutional right.  Thus, the undersigned recommends that the court decline to issue

14  a certificate of appealability.

15        Accordingly, it is **RECOMMENDED**:

16              1.  The Petition be denied.  (Doc. No. 2).

17              2.  Petitioner be denied a certificate of appealability.

18  ////

19  ////

20  ////

21  ////

22  ////

23  ### NOTICE TO PARTIES

24        These findings and recommendations will be submitted to the United States district judge

25  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14)

26  days after being served with these findings and recommendations, a party may file written

27  objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

28  Findings and Recommendations."  Parties are advised that failure to file objections within the

specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:     March 29, 2023

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE